Filed 12/16/22  P. v. McKie CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL MCKIE,<br><br>    Defendant and Appellant. | F080073<br><br>(Super. Ct. No. BF167562A)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Stephen D. Schuett, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Caely E. Fallini, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Daniel McKie appeals his convictions on one count of second degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and one count of assault on a child causing death (§ 273ab, subd. (a); count 2). Appellant argues that statements he made to the police and expert medical opinions were impermissibly admitted at his trial and evidence that could raise a reasonable doubt as to his guilt was improperly excluded. In supplemental briefing, appellant seeks a remand for resentencing based on recent changes to section 654. For the reasons set forth below, we affirm appellant's conviction and remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

The issues raised in this appeal focus on evidentiary and sentencing disputes. We thus begin with a high-level overview of the facts underlying this case. We include additional facts as needed when analyzing the claims appellant has raised.

On October 8, 2016, Anakin McKie was born. Anakin was several months premature. Anakin's mother and appellant were dating at the time. While Anakin was not appellant's child, Anakin's mother eventually gave him appellant's last name.

Anakin spent several months in the hospital. He suffered from small interventricular hemorrhages, a common form of brain bleeding in infants, but was successfully improving while in the hospital. Anakin also suffered from a perforated bowel, requiring surgery, and prematurely developed lungs, necessitating continuing oxygen treatments. While Anakin was in the hospital, appellant was accused of posting a comment on Facebook asking if anyone knew how to kill a baby while it's in the hospital. Based on this post, appellant was removed from the hospital. Anakin was released from the hospital on January 18, 2017. At the time he was still using oxygen treatments but was not suffering from any life-threatening conditions, and his health was continuing to improve.

---

[1] Undesignated statutory references are to the Penal Code.

2.

On February 26, 2017, Anakin died. Anakin's mother testified that she changed and fed him around 11:00 a.m. and that Anakin appeared fine at that time. After Anakin fell asleep, he was left in the bedroom where appellant was resting. At some point, which Anakin's mother estimated was around 30 minutes later and others stated was close to 1:20 p.m., appellant came out of the room holding Anakin and saying something was wrong with him. Paramedics arrived and found Anakin without a pulse and not breathing. He was pronounced dead at 2:09 p.m.

Appellant initially told the police that he awoke to feed and care for Anakin multiple times and he found Anakin unresponsive when checking on him. In later statements to the police, further detailed below, appellant's story changed to include claims that he tripped, fell, and dropped Anakin, resulting in Anakin's injuries.

Anakin's autopsy showed several suspicious injuries including a "patterned" injury to the head that indicated an impact had occurred and left a deep bruise, several blood clots in the brain, bleeding around his optic nerves, subarachnoid hemorrhages, blood in his spinal column, a grab mark on his leg that resulted in crushed tissue and internal bleeding, and other similar injuries. The pathologist conducting the autopsy determined that several of these injuries, and particularly the subarachnoid hemorrhages, independently established that Anakin had suffered violent head trauma. In addition, bleeding around the spinal column was identified as a classic sign of violent shaking and demonstrated a "violent whiplash-like injury during adult-inflicted trauma to an infant."

The pathologist concluded that nothing about Anakin's premature birth contributed to his death and that his injuries were inconsistent with being dropped. Anakin's death was ultimately attributed to "blunt head injuries" with the likely mechanism for causing those injuries being "[v]iolent shaking with impact of the head."

Appellant was eventually charged with first degree murder and assault on a child causing death. Following a jury trial, appellant was found guilty of the lesser included offense of second degree murder and assault on a child causing death. Appellant was

3.

found not guilty of first degree murder and was sentenced to an indeterminate term of 25 years to life based on the assault causing death conviction, with his sentence on the second degree murder conviction stayed.

This appeal timely followed.

## DISCUSSION

Appellant raises two related arguments regarding the use of statements he made to the police during his March 9, 2017 interview. In the first, appellant argues that he was effectively in custody at the point the police indicated he had committed a murder and, therefore, his *Miranda*[2] rights were violated when the police continued to obtain a statement from him, subsequently provided his *Miranda* rights, and then obtained additional incriminating statements. In the second, appellant argues that his statements were the product of improper coercion based on implications from the police of leniency if appellant confessed. As these arguments are tied to the same factual history, we rely on the factual discussion included when discussing the first for our analysis of the second.

In addition to these two related arguments, appellant separately contends the trial court improperly excluded evidence that could raise a reasonable doubt as to appellant's guilt and this court should remand the matter so the trial court can independently determine whether medical testimony concerning shaken baby syndrome is sufficiently reliable to be admissible. Finally, in supplemental briefing, appellant requests a remand for the trial court to exercise its newfound discretion as to which portion of appellant's sentence to stay under section 654. We consider each argument in turn.

### *Appellant Was Not In Custody Prior To His Initial* **Miranda** *Warnings*

The first of the two arguments appellant raises with the introduction of statements made during his March 9, 2017 interview focuses on whether his *Miranda* rights were

---

**2**     *Miranda v. Arizona* (1966) 384 U.S. 436.

4.

violated. Appellant argues that although he came to the interview voluntarily, the police engaged in a process designed to circumvent his *Miranda* rights by obtaining incriminating statements without first providing a *Miranda* warning, then correcting that error by giving *Miranda* warnings, and then having appellant repeat his incriminating statements. Appellant's arguments rely upon an underlying position that he was objectively in custody prior to the first point he was read his *Miranda* rights. For the reasons set forth below, we do not agree with that claim.

*Factual Background*

In this case, appellant made several statements to the police that were utilized at trial. Relevant to the issues raised in this appeal, appellant sought to exclude evidence of statements made to the police in an interview occurring on March 9, 2017, based on allegations that the police should have provided appellant with *Miranda* warnings earlier than they did and on the ground his statements were coerced. The trial court ultimately rejected this request, finding there was no coercion and that appellant's pre-*Miranda* statements were voluntary. Our recitation of facts regarding this appeal are focused upon the issues argued and thus do not fully detail the admissions made.

According to Senior Deputy Tanner Miller, the March 9, 2017 interview was preceded by a brief discussion on March 8, 2017. At that time, appellant asked to come to the police station to speak with Miller. Appellant arrived on March 9, 2017, with his mother and was escorted by Miller and Detective Victor Garcia to an interview room. Both officers were visibly armed and remained so during the interview but did not unholster or refer to their firearms. Appellant was not read his *Miranda* rights prior to the start of the interview. However, appellant was told that he was free to leave at any time, provided with water, allowed to use the restroom, never told he could not end the interview, never locked in the interview room, and not promised leniency in exchange for his statements. During the interview, appellant did not ask to leave, did not ask for a

lawyer, and was allowed to use the restroom, although he was escorted to the restroom by an officer.

The interview was video recorded.[3] It began with Miller and Garcia offering appellant water, informing him he was not under arrest, that he was free to leave whenever he wanted, and explaining one exit door was locked but the other was unlocked at all times. The interview then immediately shifted to having appellant provide a description of what happened the day Anakin died. The tenor of the conversation was generally informational, with the police asking for explanations or clarification but generally asking open-ended and nonleading questions. While maintaining this general type of questioning, the interview continued into issues such as appellant's relationship with Anakin's mother, the issues Anakin suffered from when born, the purported Facebook post by appellant while at the hospital, and how appellant thought the post was the result of his laptop being stolen previously. The interview was generally slow paced, with appellant being provided ample time to answer questions and describe events.

Approximately 22 minutes into the interview, Garcia first told appellant that the police were aware of "issues that came up … during Anakin's autopsy," such as injuries that "[weren't] consistent with basically, the statements that we got." Garcia told appellant they had spoken with Anakin's mother the day before and asked about any issues that were occurring at the house. Appellant was offered an opportunity to take a polygraph test and the officers left the room. A short break occurred, at which time appellant was briefly emotional, before the police told appellant the polygraph person was not present and that they would continue talking while waiting for him.

The interview then began covering topics where the police believed there were discrepancies. Issues such as bruising found on Anakin, Anakin's mother's statements

---

**3**     The court has reviewed the video as well as a redacted transcript made from the recording.

about who was caring for the child that day, and the number of times either of the two parents got up to care for Anakin were all noted. While the police made statements purportedly sympathizing with the stress that appellant would have been under while caring for Anakin, implying that they knew appellant had something he wanted to tell them, and requesting that appellant tell them whether there had been an accident that day, the questions remained informational in nature with requests for clarification or additional information, but no direct accusations of wrongdoing on appellant's part. At different times during this portion of the interview, appellant became emotional and was crying during certain answers. The police regularly gave appellant time to compose himself to answer.

This type of back and forth continued throughout the interview. However, over time, the police made more direct implications that something other than an accident may have happened. The first occurred around 37 minutes into the interview when, after noting the stress appellant had been under, Garcia stated, "I think this—this just got to you a little bit and you probably snapped a little bit." This was followed by a suggestion that appellant may not have meant to do anything and a request to "tell the entire truth." The interview then took a short break.

When the interview resumed, a new officer, Deputy Brad Brandon, was present, replacing Miller. He described his role as a polygraph technician and noted Anakin's mother had previously taken a polygraph test. Brandon told appellant that he would be asked questions during the polygraph test about whether appellant harmed Anakin or did anything to kill him. Brandon also told appellant if this was anything other than intentional murder, he needed to explain that now. Brandon told appellant that if he took the polygraph test and they found he was lying at that point, there would be no going back.

Brandon then asked what happened, and appellant responded by stating he had "tripped over [Anakin's] crib that night and I—I do get frustrated." The police asked one

of their first direct questions about what appellant may have done: Garcia asked, "Did you cover his mouth?" Brandon later asked whether appellant landed on Anakin when he tripped.

Shortly thereafter, Garcia asked appellant directly if he had "anything to do with Anakin's death," and Brandon stated that "now is the time to say it" if an accident had occurred because "like I say, if you—if you take this farther, the only conclusion we're gonna have is that it was intentional." Garcia added that the police can "still explain accidents" and "frustration" but after that, they "can't explain it anymore." At this point, appellant admitted he "got frustrated" but didn't mean to hurt Anakin before implying the bruise on Anakin's head occurred when appellant tripped. Following this statement, the police told appellant they did not believe the bruise was an accident. From there, the interview's tenor consistently included statements from the police that they did not believe appellant was telling the full truth, that appellant's explanations did not match the evidence or did not make sense, and the police pushed for answers. As the interview progressed, appellant continued to add details, including stating he had dropped Anakin, tripped over an oxygen tank, and shook Anakin when he noticed he was not breathing. Appellant even acted out brief portions of the events he was describing.

The questions from the police remained open ended and informational throughout the majority of the interview. However, as appellant provided more details, the police identified more places where they felt his statements indicated he was not telling the full truth or where his statements did not fit their view of the evidence. The police punctuated these points by showing appellant pictures of the bruising on Anakin's legs and head.

At one point, Garcia told appellant the bruise on Anakin's head would have "put him out." He followed up by saying, "That bruise was intentionally caused. I'm trying to give you the opportunity to help yourself out and make me understand how this was an accident. Because, it's one of two things. This was an accident[,] or you just straight up

8.

killed him. I'd like to believe it's an accident but you're not giving us anything that—that makes us believe that, okay? So, I got [*sic*] believe the latter that you just straight up killed him. I wanna believe this is an accident but you need to make us believe. Help us out. Help me help you." Miller then immediately changed the subject, asking about appellant's feelings when having to take primary responsibility for caring for Anakin. After a brief back and forth on this topic, Miller accused appellant of killing Anakin. First, Miller asked, "Then how did Anakin get the bruises? How did Anakin—why is Anakin dead?" then said, "Anakin is dead because somebody killed him." Appellant responded, "Okay," before Miller stated, "And not somebody killed him, you killed him." Garcia then said, "Just explain to us what happened," before appellant responded, "I killed him."

The police immediately asked appellant to again explain what happened. Appellant made a series of statements explaining he had gotten "angry and ran to the other … side of the room" before tripping over the oxygen machine and hitting the wall. During this recitation, appellant contradicted the police when they implied that he shook, squeezed, or grabbed Anakin in ways that would have caused more serious injuries. Appellant also admitted to lying in a prior interview with the police. The full scope of these statements lasted eight minutes, and as soon as they were complete, the police read appellant his *Miranda* rights. At this point, the interview had lasted roughly one hour and 20 minutes.

Appellant acknowledged he understood his rights and continued with the interview. Appellant provided additional details to the police and again acted out his version of the events leading to Anakin's death. The police continued asking open-ended questions, but also began summarizing appellant's testimony and asking whether appellant felt or acted in certain ways that appellant had not previously described. In this line of questioning, appellant eventually admitted to kicking the oxygen tank, which was attached to Anakin after tripping over it, thereby sending Anakin "towards the door" and

resulting in him no longer breathing. This additional line of questioning lasted for approximately 30 minutes and, after an extended break where the police left appellant alone in the room, appellant was arrested.

*Standard of Review and Applicable Law*

Generally, when reviewing a *Miranda* dispute " ' "we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." ' " (*People v. Henderson* (2020) 9 Cal.5th 1013, 1023.) When part or all of the questioning was recorded, the facts are undisputed and we independently review the trial court's factual determinations. (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

*Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of certain rights, such as the right to remain silent and the right to the presence of an attorney. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson, supra*, 1 Cal.5th at p. 339.)

Whether a person is in custody hinges on whether a reasonable person would feel free to leave. (*Howes v. Fields* (2012) 565 U.S. 499, 508–509; *Miranda, supra*, 384 U.S. at p. 444.) An interrogation is defined as express questioning or other words and actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from a suspect. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 299–301.) Only the issue of custody is contested in this case.

"An interrogation is custodial, for purposes of requiring advisements under *Miranda*, when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.] Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest. [Citations.] When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her]

10.

situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394–395.)  The inquiry is objective; it does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned." (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

All the circumstances of the interrogation are relevant to determining whether it was custodial.  (*People v. Moore*, *supra*, 51 Cal.4th at p. 395.)  "No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)  The most relevant circumstances typically include: "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid.*)

*Appellant Was Not In Custody Prior To The* Miranda *Warnings*

Appellant argues there came a point in his interrogation when any reasonable person would know they were no longer free to leave.  More specifically, appellant identifies this point as the moment the police "made it clear that they 'knew' appellant committed murder," which his citations suggest is roughly when Garcia asked appellant

directly if he had "anything to do with Anakin's death" and Brandon stated "now is the time to say it" if an accident had occurred because "like I say, if you—if you take this farther, the only conclusion we're gonna have is that it was intentional."

We note at the outset that prior to this point, the record does not reflect a situation where the restraint on appellant's freedom of movement was tantamount to a formal arrest. The record shows that appellant initiated the contact with a desire to speak to the police about the incident. He was uncuffed and remained in an unlocked room. He was informed he was free to leave at any time, provided with water, allowed to use the restroom, never told he could not end the interview, never locked in the interview room, and not promised leniency in exchange for his statements. Further, the questions were neither accusatory nor improper. In all, appellant was provided with the opportunity he asked for, a chance to speak with the police, and a reasonable person in that situation would have known they could end the interview.

The question thus becomes whether this objectively noncustodial interrogation changed when the police began questioning appellant more directly about conflicts in the evidence and their belief that Anakin's death was not an accident. Upon review of the record, we conclude no such change occurred. The main change in tenor of the interrogation related to the police identifying their belief that appellant was not telling the full truth, indicating that appellant's continued failure to tell the truth would result in a conclusion he killed Anakin, and eventually informing appellant he was suspected of killing Anakin. However, even with this change in tenor, the overall nature of the interrogation was not the type of coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest.

"Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." (*Stansbury v. California*, *supra*, 511 U.S. at p. 325.) In this case, the police kept most of their questions open

12.

ended and informational in nature even after identifying problems with appellant's version of the facts. As appellant's story continued to shift, the police began focusing upon inconsistencies and informing appellant that these issues were limiting the way they could view the matter. They did not, however, engage in aggressive tactics or otherwise indicate to appellant he was under arrest. There is no objective indication in this part of the record that, had appellant recognized his statement was causing more harm than good, he could not have chosen to end the interview and leave. Only after appellant potentially admitted to killing Anakin and provided a more direct explanation of what happen did this potentially change. However, at this point, the police immediately provided *Miranda* warnings before proceeding.

Given the record, we conclude that appellant's interview was not custodial in nature prior to the point that the police provided him with *Miranda* warnings. Accordingly, because *Miranda* warnings were not required prior to the point the police provided them, appellant's argument that the police engaged in an inappropriate, two-stage interrogation designed to thwart the protections of *Miranda* also fails. There was no intentional attempt to circumvent *Miranda* by withholding warning until after a confession was obtained. (See *Missouri v. Seibert* (2004) 542 U.S. 600, 620 [statement improperly admitted where warning was withheld to obscure both the practical and legal significance of the admonition when finally given].)

### *Appellant's Statements Were Voluntary*

Appellant's second argument regarding the admission of his statements contends that his statements were coerced and thus not voluntarily made. Appellant argues the police made sufficient promises of leniency through references to the potential that Anakin's death was an accident brought on by stress to coerce a confession, particularly so because the police knew at the time the autopsy resulted in a homicide conclusion.

13.

*Standard of Review and Applicable Law*

"When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement was, in fact, voluntary. [Citation.] On appeal, we accept the trial court's factual findings as to the circumstances surrounding the confession, provided they are supported by substantial evidence, but we review de novo the ultimate legal question of voluntariness." (*People v. Battle* (2021) 11 Cal.5th 749, 790.) "The facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded, making the issue subject to our independent review." (*People v. Linton* (2013) 56 Cal.4th 1146, 1177 (*Linton*).)

We consider a statement involuntary if it is the product of "coercive police conduct." (*People v. Williams* (2010) 49 Cal.4th 405, 437.) We evaluate the totality of the circumstances to determine "whether the defendant's ' "will has been overborne ..." ' by coercion." (*Id.* at p. 436.) Relevant factors include the location of the interrogation, whether the interrogation was repeated or prolonged, whether the defendant was deprived of food or sleep, and whether the officers made threats or promises or used deceptive practices, among others. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226; *People v. Dykes* (2009) 46 Cal.4th 731, 752; see *Linton*, *supra*, 56 Cal.4th at p. 1178.) The presence of police coercion is a necessary, but not always sufficient, element. (*Williams*, at p. 436.) Further, vague statements that cooperation will be beneficial or that telling the truth will work in one's favor are generally considered insufficient to qualify as a promise of leniency without more. (See *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1107–1108 [citing cases holding the same].)

*Discussion*

Appellant's claim in this case is that his purported confession was coerced by the police because they implied that a statement confirming Anakin's death was an accident

14.

may result in leniency, despite knowing Anakin's death was not an accident.**4** We do not agree that the statements made by the police seeking explanations for the injuries Anakin suffered rise to the level of coercive action. "To the contrary, [the] suggestions [made by the police] that the [incident] might have been an accident, a self-defensive reaction, or the product of fear, were not coercive; they merely suggested possible explanations of the events and offered defendant an opportunity to provide the details of the crime. This tactic is permissible." (*People v. Carrington* (2009) 47 Cal.4th 145, 171.) Indeed, the case law indicates that the tactics in line with those used in this case are insufficient to demonstrate coercion. For instance, confronting a defendant with inconsistencies in his statement is "not an improper interrogation technique, as an interrogation may include ' "exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect." ' " (*People v. Spencer*, *supra*, 5 Cal.5th at p. 674; see *Linton*, *supra*, 56 Cal.4th at p. 1178 [officers can exhort a suspect to tell the truth and repeatedly express that they believe a suspect is lying]; *People v. Williams*, *supra*, 49 Cal.4th at p. 444 [officers can engage in vigorous questioning of suspects meant to ascertain a defendant's involvement in crimes].) This is especially so where the officer's exhortations and persistent questions are relatively "low key," as they were in this case. (*Linton*, at p. 1178.)

Based on the totality of the circumstances, we conclude that appellant's statements were voluntary. While the police sought to obtain a statement from appellant, they did so primarily by allowing appellant to explain his position and then systematically contesting

---

**4** Appellant does not make any claims relating to more direct forms of coercion. Upon review of the record, we find none in the overall conduct of the police. (See *People v. Spencer* (2018) 5 Cal.5th 642, 672–673 [finding no coercion where assertions lacked claims of physical intimidation or deprivation, officer gradually obtained more incriminating details and refrained from "vituperative statements," name-calling, any obvious strong-arm tactics, and "base appeals to [the defendant]'s deeply held beliefs, and the defendant "also had the wherewithal to articulate—time and again—a version of events that minimized his involvement" before finally admitting guilt].)

15.

that story based on contradictory evidence. In this context, their statements that an accidental injury could be understood do not rise to the level of promising leniency for a confession. The notion of an accident being understandable does not indicate that appellant would avoid arrest or serious conviction if he admitted to causing Anakin's death. Accordingly, we find no error in the admission of appellant's statements.

## *Appellant's Evidence Was Not Improperly Excluded*

Appellant's third argument contends the trial court abused its discretion by excluding evidence that could have raised a reasonable doubt as to appellant's guilt.

*Factual and Procedural Background*

Appellant's briefing discusses three instances where evidence offered by appellant was excluded by the trial court allegedly based on a finding it violated a ruling precluding evidence relating to third party culpability claims. As appellant notes, the issue of third party culpability evidence was first raised in a pretrial motion. At that time, the trial court refused to issue a blanket exclusion and instructed the parties it would consider any contested proffered evidence under *People v. Hall* (1986) 41 Cal.3d 826.

At trial, the first issue arose during appellant's cross-examination of Anakin's mother. Appellant elicited testimony from Anakin's mother that appellant's sister had entered the room where Anakin and appellant were on the morning Anakin died. Appellant then sought to elicit testimony relating to previous fights or arguments between appellant's sister and Anakin's mother. At this point the prosecution objected and a sidebar was held. The trial court sustained the objection and later placed on the record a statement concerning the sidebar. In that statement, the court explained it had excluded the evidence of past arguments on relevance grounds because there was no evidence that any past history between appellant's sister and Anakin's mother would support an argument that appellant's sister had killed Anakin.

In later questioning, appellant sought to elicit additional testimony concerning whether Anakin's mother saw appellant's sister enter Anakin's room. In this instance,

Anakin's mother claimed not to have seen anyone else enter Anakin's room. When pressed on this statement the prosecution objected based on the trial court's prior ruling, and the trial court sustained all of the objections thereby precluding any further statement from Anakin's mother on this point. A sidebar was held. The parties later placed their positions at the sidebar on the record. Appellant argued that the location of all people in the house was relevant to his potential defenses. In response, the court explained it had asked for some form of offer of proof that would link appellant's sister to the crime, exclusive of mere presence, in order to warrant the questions. No further discussion ensued.

The second instance arose during appellant's cross-examination of the doctor that had treated Anakin when he was first born. Appellant began by asking the doctor to define a condition in premature newborns called ventriculomegaly. After some background discussion on the condition, appellant sought to ask questions regarding brain bleeding and brain pressure caused by the condition. The prosecution objected to these questions on grounds that they lacked foundation, were not relevant, and assumed facts not in evidence, which the trial court sustained. There is no indication the parties discussed how the evidence connected to third party culpability concerns during this exchange.

The third instance occurred during appellant's testimony. In questioning regarding appellant's relationship with Anakin's mother, he was asked about any emotion she showed when the two were living together. As part of his response, appellant stated Anakin's mother would "throw tantrums. She would yell at me a lot. There were times where she hit me." The prosecutor objected that this response violated the court's in limine rulings. The court agreed and struck the answer. Appellant's testimony continued and he answered several questions relating to Anakin's mother's attitude when caring for Anakin and her general composure as a mother, including a specific example where

Anakin's mother turned to appellant for help when she could not get Anakin to stop crying.

Appellant's counsel then asked whether Anakin's mother had showed any frustration with Anakin. This drew an immediate objection followed by an extended sidebar discussing the court's ruling on third party culpability evidence and questions touching on that subject. In that sidebar, appellant's counsel explained the desire to discuss other people being in the room the morning Anakin died came from information the prosecution had provided and was thus not a surprise tactic. Appellant's counsel also noted that the court had not been aware of the prosecution's disclosure relevant to this argument at the time it made its initial ruling. The court affirmed that it did not intend to change its prior view that appellant needed to provide some direct or circumstantial evidence linking the third person to the actual perpetration of the crime through at least an offer of proof to permit such evidence into the trial. Having heard no such offer, the court affirmed its belief that such evidence was properly excluded under Evidence Code section 352.

*Standard of Review and Applicable Law*

" 'To be admissible, the third-party evidence need not show "substantial proof of a probability" that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.… [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.] We emphasized that 'courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352).' [Citation.] A trial court's

18.

discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion." (*People v. Lewis* (2001) 26 Cal.4th 334, 372–373, fn. omitted, second & fifth bracketed insertions added.)

*Discussion*

Although appellant cites to cases that discuss the rules governing third party culpability evidence, his arguments tend to analyze the evidentiary rulings in this case on alternative grounds. Thus, when discussing questions to Anakin's mother about who else may have had access to Anakin, appellant argues Anakin's mother's excluded testimony "would have impeached her testimony[] and called her credibility into account." With respect to the questions about ventriculomegaly, appellant argues the trial court's ruling precluded "any inquiry into the possible causes of brain bleeding in infants" and that such evidence was not third party culpability evidence at all. Finally, with respect to appellant's excluded testimony, appellant contends the evidence in this case could not rule out prior injuries causing Anakin's death based on the many potential causes of infant brain bleeding and, therefore, it was "entirely relevant [to inquire] as to who inflicted … earlier injuries." Appellant concludes, though, with a third party culpability argument alleging the rules governing third party culpability evidence are inconsistent with due process and the Sixth Amendment.

Regardless of the bases underlying appellant's positions, we find no abuse of discretion in the trial court's decisions to exclude the three lines of questioning identified by appellant. The court's rulings properly followed the rules outlined by our Supreme Court for introducing third party culpability evidence, requiring some direct or circumstantial evidence linking the third person to the actual perpetration of the crime before allowing evidence that the court finds otherwise excludable under Evidence Code section 352 to be introduced. With no offer of proof made that any other individual could be linked to Anakin's death, the court could reasonably conclude that evidence of third party culpability was irrelevant or subject to exclusion under Evidence Code section 352.

19.

Further, we find no basis in the record for finding our Supreme Court's test for admissibility of third party culpability evidence is constitutionally infirm. The test itself turns upon notions of relevance and the general authority of the court to exclude unduly prejudicial evidence under Evidence Code section 352. And the record in this case shows the trial court considered the evidence as infirm both for relevance and prejudice grounds. It is well settled that the application of general rules of evidence does not violate a defendant's constitutional rights. (*People v. Abilez* (2007) 41 Cal.4th 472, 503–504.)

Nor do we see any error if the evidence is viewed outside of the constructs of third party culpability issues. The exclusion of cross-examination questions regarding Anakin's mother's credibility was within the trial court's discretionary authority to limit cross-examination. (See *People v. Elliott* (2012) 53 Cal.4th 535, 579 [" ' "[N]ot every restriction on a defendant's desired method of cross-examination is a constitutional violation," ' and ' "the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance." ' "].) This is particularly so given that the record already contained a question and answer affirming that Anakin's mother did, in fact, see appellant's sister enter Anakin's room. Her later contradiction of that testimony provided appellant with sufficient record evidence to test her credibility.

With respect to the ventriculomegaly questions, appellant has failed to demonstrate Anakin suffered from the condition. Accordingly, appellant has failed to demonstrate the court erred when, after permitting background questions on the nature of the condition, it limited further questioning. Finally, appellant has likewise failed to demonstrate the court erred in excluding testimony that Anakin's mother hit him or that she had negative feelings toward Anakin. Appellant's argument turns on a claim that other bases for Anakin's death rendered the evidence relevant. But this court has rejected the claim that appellant was wrongly prevented from asking questions about ventriculomegaly, and appellant has failed to argue or show there were other relevant

bases for the evidence proffered. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 681–682.) "[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*Id.* at p. 684.)

### *Appellant's* **Kelly/Frye**[5] *Hearing Argument*

Appellant's fourth argument contends that expert medical evidence presented regarding the manner of Anakin's death should have been excluded as unreliable under a *Kelly/Frye* theory. Appellant alleges that he was convicted on a shaken baby theory of harm that has been rejected by modern science. The People respond by arguing appellant has forfeited this claim for failing to raise it below and, regardless, the evidence introduced here is not subject to *Kelly/Frye* analysis because it is expert medical testimony. We agree with the People that a *Kelly/Frye* hearing is not appropriate for challenging the expert medical testimony in this case.[6]

*Applicable Law*

"The hallmark of the *Kelly/Frye* rule … is that the proponent must establish, 'usually by expert testimony,' that the technique is ' "sufficiently established to have gained general acceptance in the particular field in which it belongs." ' [Citation.] The proponent also must establish that 'the witness furnishing such testimony' is 'properly qualified as an expert to give [such] an opinion.' [Citation.] The third and final requirement … is for the proponent to show that 'correct scientific procedures were used

---

[5] The *Kelly/Frye* rule (*People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, superseded by the Federal Rules of Evidence, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579) conditions the "admissibility of expert testimony based upon the application of a new scientific technique" on a "preliminary showing of general acceptance of the new technique in the relevant scientific community." (*Kelly*, at p. 30.)

[6] For efficiency purposes, we do not specifically reach the People's forfeiture claim. However, we note that appellant's requested remedy, a remand so the trial court can take and consider evidence on reliability for the first time, strongly supports the People's assertion that this claim was not raised below.

in the particular case.' " (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155 (*Stoll*), second bracketed insertion in original.)

"While the standards imposed by the *Kelly/Frye* rule are clear, the definition of a 'new scientific technique' is not." (*Stoll*, *supra*, 49 Cal.3d at p. 1155.) Accordingly, at least two themes have developed in analyzing such claims. "First, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*Id.* at p. 1156.) "The second theme in cases applying *Kelly/Frye* is that the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury." (*Ibid.*) "However, absent some special feature which effectively blindsides the jury, expert opinion testimony is not subject to *Kelly/Frye*." (*Id.* at p. 1157.) Because of this, our Supreme Court recognized that it has never applied *Kelly/Frye* to expert medical testimony. (*Ibid.*)

A decision concerning the admissibility of evidence is subject to review for abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 266.) "This is especially so when, as here, the evidence comprises expert opinion testimony." (*Ibid.*) However, the "conclusion that a certain legal principle, like the *Kelly/Frye* rule, is applicable or not in a certain factual situation is examined independently." (*Ibid.*)

*Discussion*

The evidence in this case falls outside of the protections of the *Kelly/Frye* rule. As in *Stoll*, none of the concerns addressed by *Kelly/Frye* are present in the contested evidence, and the methods employed are neither new to medicine or the law nor do they carry a misleading aura of scientific infallibility. (See *Stoll*, *supra*, 49 Cal.3d at p. 1157.) We thus find no indication that a *Kelly/Frye* hearing was required in this case.

Appellant contends that this is a " 'reverse' application of the *Kelly* rule" involving a scientific method that has fallen out of favor and is limited to a specific situation where "a conviction was based on the 'classic[]' triad of [shaken baby

syndrome] indicators" and not other evidence of harm. However, we read nothing in *Kelly/Frye* that would support a "reverse" application of the rule. Rather, in such circumstances, cross-examination based on the current scientific evidence is a more than effective means to overcome the claim of stale science. Further, to the extent appellant argues this case is limited to a "classic" shaken baby syndrome claim, the record contradicts that finding. While there was not extensive evidence of shaking, the record did include evidence of bruising to Anakin's head and leg that were consistent with the medical conclusion that Anakin's death was nonaccidental. The expert medical testimony on the mechanism and manner of Anakin's death was sufficiently reliable to be admitted and was thus subject to challenge on cross-examination, not through a post-hoc remand for additional evidence on reliability.

### *Remand To Apply Assembly Bill No. 518*

In supplemental briefing, appellant requests a remand for resentencing given the benefit of newly enacted Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518). The People agree and do not oppose the remand request.

Prior to its amendment by Assembly Bill 518, section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).) Effective January 1, 2022, Assembly Bill 518 amended section 654 to provide, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), as amended by Stats. 2021, ch. 441, § 1.) Thus, a trial court is no longer required to impose a sentence under the crime providing for the longest possible sentence but may sentence a defendant under any one of the applicable crimes.

23.

Here, the trial court specifically sentenced appellant under former section 654, the controlling law at that time, stating: "With respect to Count 2, which is a violation of Penal Code Section 273AB(a), the sentence for Count 2 is the greater sentence. The Court will sentence [appellant] for the conviction under Penal Code Section 273AB(a). Court will deny probation and sentence [appellant] to a term of 25 years to life." The court similarly stayed the 15-year-to-life sentence imposed for the second degree murder conviction. With the passage of Assembly Bill 518, the trial court now has discretion in this case to choose a term of incarceration applicable to either count 1 or 2, while staying the term applicable to the other count. Appellant is entitled to the benefit of Assembly Bill 518 upon resentencing.

## DISPOSITION

Appellant's sentence is vacated, and the matter is remanded for the trial court to exercise its discretion under section 654, as amended by Assembly Bill 518. (Stats. 2021, ch. 441, § 1.) In all other respects, the judgment is affirmed.

HILL, P. J.

WE CONCUR:

DETJEN, J.

PEÑA, J.

24.